# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JEONGAH KIM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  5:12-cv-2190-TMP |
| | ) | |
| THE BOARD OF TRUSTEES  of the | ) | |
| ALABAMA AGRICULTURAL AND | ) | |
| MECHANICAL UNIVERSITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This cause is before the court on the motion for summary judgment filed November 21, 2013, by the defendants.  (Doc. 47). The motion was supported by a brief and evidentiary submission.  (Docs. 48-54).  Plaintiff filed an opposition to the motion, supported by evidence on December 31, 2014.  (Docs. 59, 60).  The defendants filed a brief in reply on January 13, 2014.  (Doc. 62).  Plaintiff, Jeongah Kim, an Asian female of Korean descent, alleges that her former employer, defendant Alabama Agricultural and Mechanical University ("A&M"),[1]

---

[1]     Defendants are the Board of Trustees of Alabama A&M University, Dr. Daniel Wims, in his official capacity as Provost of A&M, and Dr. Andrew Hugine, in his official capacity as President of A&M.  All claims are essentially claims against the university and are referred to herein as claims against A&M, or the defendant.

discriminated against her on the basis of her race, gender, and/or national origin. She further asserts that after she complained of race and national origin discrimination, A&M retaliated against her by scrutinizing her requests for travel more closely than those of her colleagues. She also seeks redress for discrimination pursuant to 42 U.S.C. §§ 1981 and 1983. The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c); accordingly, the court enters this memorandum opinion.

## I.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of

some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials negating the opponent's claim."  Id. at 323.

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting former Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.  Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute

is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at

255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  <u>Brown v. City of Clewiston</u>, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  FACTS

Applying the above-referenced standards to the evidence in the record, the following facts appear to be undisputed, or, if disputed, are viewed in the light most favorable to the non-moving plaintiff.

Dr. Kim is an Asian female of Korean descent.  Alabama A&M employed her as an assistant professor in the Department of Social Work from 2004 until 2012.  Her appointment as an assistant professor was for a five-year probationary period, at the end of which her employment would end if she did not successfully obtain tenure.  In August 2009, Dr. Kim received a letter from then Provost and Vice President for Academic Affairs Beverly C. Edmond (Kim Depo, Ex. 5, doc. 52, p. 125 of 153) informing her that her five-year probationary period would end during the 2009-2010 academic year and that she was required to apply for tenure.  Dr. Kim applied for tenure and a promotion to associate professor in October 2009.

The processes for seeking tenure and promotion were (and are) set out in the Faculty/Administrative Staff Handbook promulgated by A&M in 2003.  (Wims

Aff. Ex. 1, docs. 49-1 & 50) (referred to hereafter as "Faculty Handbook," with references to page numbers in the Handbook).  Although similar, seeking tenure and applying for promotion are two distinct processes.   A faculty member may apply for one or the other or both (Faculty Handbook, pp. 45-52), and Dr. Kim applied both for tenure and promotion.  In the event a faculty member applies for both tenure and a promotion, the promotion decision is subject to and contingent upon the tenure decision.  At page 49, the Faculty Handbook noted, "A faculty member may apply for tenure and promotion in the same academic year. However, the tenure application must be considered first.  If tenure is denied, then the promotion will not be considered."  Additionally, the Faculty Handbook stated, "If tenure is denied by the University, then the candidate is given one-year notice of termination of service."

In two separate letters dated July 1, 2010, Dr. Kim's first application for tenure and promotion was denied.  (Kim Depo., Exs. 6 & 7, doc. 52).  Each letter advised her that her promotion and tenure, respectively, were denied "based on your lack of scholarly work and productivity."  (*Id.*)  In the letter denying tenure, she was informed that the 2010-2011 academic year would be her terminal year. (Kim Depo., Ex. 7, doc. 52, p. 129 of 153).   Pursuant to the procedures in the Faculty Handbook, Dr. Kim appealed both denials, and on September 8, 2010, Dr. Daniel Wims, informed her by letter that "the Promotion and Tenure Appeals

Committee ha[d] recommended reversal of your denial for promotion to Associate Professor."  Dr. Wims's letter went on to inform her that, notwithstanding the recommendation of the appeals committee, he had recommended to the president of the University that the denial be upheld and that the final decision was the president's.  (Kim Depo. Ex. 8, doc. 52, p. 131 of 153).  In a letter dated February 15, 2011, the A&M president, Dr. Hugine, accepted Dr. Wims's recommendation to deny the promotion, but he encouraged her to "resubmit your portfolio with any additional documentation of productivity that you now have for review by the committee." (*Id.,* Ex. 10, doc. 52, p. 133 of 153).  Plaintiff was allowed to submit the additional information "in this cycle for review."  A similar letter dated February 22, 2011, from Dr. Hugine also upheld the denial of her tenure application, but also encouraged her to resubmit the application with additional documentation of academic productivity "in this cycle for review."[2] (*Id.,* Ex. 11, doc. 52, p. 135 of 153).

---

[2]   The court is not clear whether the reference to "this cycle" means the 2009-2010 academic year cycle or the 2010-2011 academic year cycle for promotion and tenure applications.  When Dr. Kim first applied, it was during the previous year's cycle in academic year 2009-2010.  It was not until July 2010, at the end of that academic year that she was informed of the decisions to deny promotion and tenure.  Nonetheless, the reference may mean that she would be allowed to resubmit her application under an extension of the original cycle in which she applied.  It may also mean that Dr. Kim would be allowed to resubmit her application during the 2010-2011, which was then underway.  In any event, it is clear that Dr. Kim's employment was extended an additional year past 2011

Dr. Kim applied again for tenure and promotion during the 2010-2011 academic year.  Her application was again denied.  In a letter dated June 20, 2011, President Hugine advised that her tenure application was denied due to "your lack of peer reviewed, juried and/or refereed scholarly productivity in the discipline."  It further advised her that the 2011-2012 academic year would be her terminal or last year of employment at A&M (*Id.*, Ex. 13, doc. 52, p. 139 pf 153), and she terminated her employment in May 2012.

Dr. Hugine has been the President of A&M since July 2009.  Dr. Wims replaced Dr. Edmond as Provost and Vice President for Academic Affairs at A&M in April 2010.

In June 2003, A&M adopted the Faculty Handbook, which remained in effect at all times relevant to this action.  (Doc. 54, Affi. Of Wims, Ex. 1, p. 47).  The guidelines for applying for tenure and promotion are set forth in the handbook as follows:

### 4.4    Faculty Promotion and Tenure Criteria and Procedures

The American Association of University Professors (AAUP) states:  "Tenure is a means to certain ends; specifically, (1) freedom of teaching and research and of extramural activities, and (2) a sufficient degree of economic security to make the profession attractive to men and women of ability.  Freedom and economic security, hence tenure,

---

(contrary to the letter of July 1, 2010 (Ex. 7)) in order to provide her with the opportunity to resubmit her tenure and promotion application.

is indispensable to the success of an institution in fulfilling its obligations to its students and society."  Alabama A & M University concurs with this statement.

Alabama A & M University is a leading teaching, research, and extension university in the region and in the nation.  Tenure is granted to those faculty members who show evidence of substantial growth and future promise.  Except in unusual circumstances, tenure will be granted only to persons with the terminal degree.

### Promotion and Tenure Application Procedures:

The application for promotion or tenure may be initiated by the individual faculty member, unit supervisor, or dean of the school.  The steps listed below should be followed:

A. An application for promotion and tenure shall be submitted using Promotion and Tenure Forms in Appendix B and guidelines listed in Section 4.3.  Forms and guidelines may be requested from the department chairperson, dean of the school or Office of Academic Affairs.

B. Each year Academic Affairs will disseminate a time table for promotion and tenure procedures, so that faculty may comply.  The application for promotion or tenure may be initiated at any point between the beginning of the fall semester and November 1st, at which time all promotion materials are due in the Office of Academic Affairs.

C. Applications are submitted first to the departmental chairperson who in turn submits them to the Departmental Review Committee.   After review, evaluation and recommendation from the Departmental review committee, applications are submitted to the Dean of the School who in turn submits them to the School Review Committee.  Upon completion by the school review committee, applications are submitted by the Dean of the School to the Office of Academic Affairs.  The Office of Academic Affairs will not accept applications that have not followed the above established procedures and deadlines.

    D. The office of Academic Affairs notifies candidates of the receipt of application and in turn submits the same to the Promotions and Tenure Committee by November 15th.

    E. The Promotions and Tenure Committee shall complete its recommendations by February 15th and submit them to the Provost/Vice President for Academic Affairs who shall in turn make recommendations to the President by March 1st. Applicants are notified of the final decision upon review by the President by March 15th of the same year.

(Faculty Handbook, Doc. 50, pp. 47-48).

Faculty members may apply for tenure after serving a mandatory probationary period. Instructors have a probationary period of seven years, with a five-year period for assistant professors, a three-year period for associate professors, and a one-year period for full professors. (*Id.* at 48). Faculty members may apply for tenure and promotion during the same academic year; however, the Handbook provides that tenure is considered first, and that "[i]f tenure is denied then the promotion will not be considered." (*Id.* at 49). If tenure is denied, the faculty member is given notice that his or her employment will be terminated in one year. (Id.)

The Handbook also lists the requirements a candidate must meet to be given tenure, only one of which is at issue in this case:[3]

---

[3]    It is undisputed that the plaintiff met the other requirements for acquiring tenure, such as years of service, membership in a professional society, letters of recommendation, and a teaching portfolio. (Doc. 50, p. 59).

G.  Scholarly Activities
> Publication in refereed journals, scholarly books, chapters in scholarly books, research reports, attendance at scientific/ professional meetings, reviewer for journal, proposals, creative works, etc. related to the discipline.

(Faculty Handbook, Doc. 50, p. 49).   Finally, the Handbook details the application process, which involves a promotion and tenure committee that makes recommendations to the Provost, who in turn makes recommendations to the President.   The provision governing the process of reaching final decisions with regard to tenure and promotion also provides that:

> It is expressly declared that the process of determining whether to grant promotion or tenure involves determination and assessments which are inherently subjective in their nature and Promotion and Tenure Committee decisions are vested in the absolute discretion of the Committee to make its recommendations and the Provost and President in making final decisions concerning the applicants.

(Id. at 51).

After completing five years as an associate professor at A&M, Dr. Kim submitted her first application for promotion and tenure in October 2009.   In preparing her application, she reviewed the relevant provisions of the Faculty Handbook.   Her application listed as scholarly publications: (1) one article on which she was the second-listed author with another A&M faculty member and which had not yet been published; (2) an article that was connected with her

doctoral dissertation at Ohio State University; (3) an article that had been submitted but not yet accepted or published, and (4) numerous articles in a publication entitled *Social Welfare*.

The only articles Dr. Kim had authored (and not co-authored), and which had been published during the years she taught at A & M, were the *Social Welfare* articles, which were published in South Korea, in the Korean language.   Dr. Kim did not provide any English translations of the *Social Welfare* articles with her application, and no information was provided that described the publication selection process employed at *Social Welfare.*  Dr. Wims attempted to "verify the credibility and veracity" of Dr. Kim's publications in *Social Welfare*, but was unable to locate any college in a five-state area that had *Social Welfare* in its library.   Although the Tenure and Promotion Committee recommended that Dr. Kim's application for tenure and promotion be granted, Dr. Wims recommended to Dr. Hugine that Dr. Kim's application be denied on the basis of the lack of scholarly publications.

On July 1, 2010, Dr. Hugine sent Dr. Kim a letter informing her that the University had denied her application based upon her "lack of sufficient scholarly work or productivity."   (Doc. 52, Ex. 7).   She also was informed that her employment would be terminated at the end of the 2010-2011 academic year.  (*Id.*) On August 30, 2010, the chair of the social work department indicated by letter to

the Tenure and Promotion Committee that she believed that *Social Welfare* was a peer-reviewed journal. Her belief was based on an email conversation with the editor of *Social Welfare*. No other information regarding *Social Welfare* was provided.

Dr. Kim appealed the 2010 decision denying tenure, and received the approval of the Tenure and Promotion Committee. Dr. Wims, however, notified Dr. Kim in September and October 2010 that he was recommending the denial of her appeal "based on the lack of scholarly work or productivity," and further told her that the final decision would be made by Dr. Hugine. (Doc. 52, Ex. 8). By letters dated February 15 and 22, 2011, Dr. Hugine informed Dr. Kim that he was going to adopt Dr. Wims' recommendation of denial of her appeal regarding promotion and tenure, but that she could "resubmit" her application "with any additional documentation of productivity" for review during the 2010-2011 evaluation process. (Doc. 52, Exs. 10, 11).

Dr. Kim submitted another application for promotion and tenure, which included an additional letter of recommendation, two additional academic presentations by her, a grant she had received, and a revised application letter. She did not include any additional publications, nor did she provide any additional information regarding the *Social Welfare* articles or any translations of the Korean articles. (Kim Depo., doc. 52, pp. 303-04). The Promotion and Tenure Committee

again recommended plaintiff for tenure and promotion.  Dr. Wims, however, again recommended to Dr. Hugine that the application be denied.   By letter dated June 20, 2011, Dr. Hugine informed Dr. Kim that her application for tenure had been denied "based on your lack of peer reviewed, juried and/or refereed scholarly productivity in the discipline."   He further told Dr. Kim that her employment would be terminated at the end of the 2011-2012 academic year.  (Doc. 52, Ex. 13).  A letter dated July 5, 2011, further informed Dr. Kim that her application for promotion was denied based upon the "lack of sufficient peer reviewed, juried, or refereed scholarly productivity as the first author in the discipline."  (Doc. 52, Ex. 14).

Dr. Kim appealed the second denial of her application for tenure and promotion.  Dr. Wims recommended the denial of her appeal, based upon "lack of sufficient peer reviewed, juried, and/or refereed scholarly productivity as first author in the discipline."  (Doc. 52, Ex. 15).   Dr. Wims has testified that he believed that, in order to accept *Social Welfare* as a peer-reviewed or juried scholarly publication, A&M would have to deviate from the criteria employed in its promotion and tenure process during his tenure as Provost and Vice President at A&M.  (Wims Affi., ¶ 35, Doc.52, Ex. A)  The appeal then went to Dr. Hugine for a final decision, and he upheld the decision denying tenure and promotion.

(Doc. 52, Ex. 16).  He further informed Dr. Kim that the 2011-2012 academic year would be her last year of employment at A & M.  (Id.)

Plaintiff filed three charges with the Equal Employment Opportunity Commission in connection with the applications for tenure and promotion.  In December 2010, she filed a charge alleging that A&M, Dr. Hugine, and Dr. Wims[4] discriminated against her by failing to grant her application for tenure and failing to grant her application for a promotion in 2010 on the basis of her national origin and race.  (Doc. 52, Ex. 19).  She filed a second charge on May 1, 2011, alleging that A&M retaliated against her in that they did not inform her of the deadline for re-application and thereby "prevented her from reapplying" in the 2010-1011 academic year.  Dr. Kim further alleges that A&M retaliated against her by subjecting her travel requests to heightened scrutiny.  (Doc. 52, Ex. 20).  Dr. Kim filed a third EEOC charge on June 20, 2012, alleging that she also was discriminated against on account of her gender.  (Doc. 52, Ex. 21).

---

[4]    Hereinafter, the defendants will be referred to collectively as A&M or the defendant.  Both Dr. Wims and Dr. Hugine are sued only in their official capacities, and, therefore, are essentially only other names for the university itself, for which the Board of Trustees is the proper party.  (See Docs. 31, 32).

## III. DISCUSSION

Plaintiff alleges that the defendant, Alabama A&M University discriminated against her based on her race, national origin, and gender, and that the defendants retaliated against her after she filed her first EEOC charge.[5]   A&M's motion for summary judgment seeks summary dismissal of plaintiff's claims.   Defendant contends that plaintiff's discrimination claims are due to be dismissed because: (1) she has failed to demonstrate that the defendants had any intent to discriminate; (2) she has failed to demonstrate that she was qualified for the tenure or promotion she sought; (3) she has failed to show that any equally or less qualified employees outside of her race, national origin, or gender were given tenure or promotion; and because (4) the defendant had a legitimate, nondiscriminatory reason to deny her applications for tenure and promotion.   The defendant asserts that Dr. Kim failed to

---

[5]      The plaintiff's complaint clearly sets forth separate claims for discrimination based on race, national origin, and gender.   (Doc. 16).   In her deposition, Dr. Kim asserts that she was not discriminated against as a female, an Asian or as a person of Korean descent separately, but because she is a member of all of these protected classes in combination.   (Doc.52, Depo. of Kim, pp. 284-285, 360).   In her brief filed in opposition, Dr. Kim attempts to make a "race-plus-plus" claim of discrimination, which she bases on the Fifth Circuit Court of Appeals decision in Jefferies v. Harris County Comm. Action Ass'n, 615 F.3d 1025 (1980), which held that it was error for the district court to fail to address a claim that discrimination was against black females, even when black men or white women were not discriminated against by the employer. (Doc. 60, p. 3).   The defendant asserts, in its reply brief, that the race-plus-plus claim has not been properly pleaded and cannot now be asserted.   (Doc. 62, pp. 4-8).   The court will assume, without deciding, that there exists a protected class made up of Asian females of Korean descent, and that the plaintiff's claims of discrimination may be viewed in combination, not as separate claims of race, gender, and national origin.

prove her *prima facie* case of retaliation.  The defendant further asserts that her § 1983 claim must fail both because there is no liberty or property interest in a non-tenured position and, thus, no right to procedural due process, and she was not purposefully or intentionally denied equal protection based on her status as an Asian female of Korean descent.

## A.  TITLE VII DISCRIMINATION CLAIMS

Title VII prohibits discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Specifically, the statute provides that it shall be unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

2 U.S.C. § 2000e-2(a)(1). A plaintiff may prove a *prima facie* case of discrimination under Title VII by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she is qualified to do the job; and (4) her employer treated similarly situated employees who are not members of the protected class more favorably.  See Maniccia v. Brown, 171

F.3d 1364, 1368 (11th Cir. 1999).[6]  A disparate treatment claim requires proof of discriminatory intent, through the use of either direct or circumstantial evidence. See, *e.g.,* Equal Employment Opportunity Commission v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000).  In order to establish a *prima facie* case of race discrimination, a plaintiff may present to the court: (1) direct evidence that "discriminatory animus played a significant or substantial role in the employment decision," Eskra v. Provident Life and Accident Ins. Co., 125 F.3d 1406, 1411 (11th Cir. 1997), or (2) circumstantial evidence of discrimination, in accordance with the four-part test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), or (3) statistical evidence of a pattern of discrimination.  Zaben, 129 F.3d at 1457.

---

[6]      Although this case appears at the outset to be a failure-to-promote claim, it is more properly viewed as an ordinary disparate treatment claim.  The promotion to associate professor was not akin to an "opening" that needed to be filled by one applicant.  The result, which hinges upon the showing of pretext, would lead to the same result even if the claim were viewed as a failure-to-promote.  However, the case law governing those promotion claims is, at best, a mess of conflicting precedent.  See Walker v. Mortham, 158 F.3d 1177, 1187-90 (11th Cir. 1998) (discussing the intra-circuit conflict between Perryman v. Johnson Products Co, Inc., 698 F.2d 1138 (11th Cir. 1983) and Crawford v. Western Elec. Co., 614 F.2d 1300 (5th Cir. 1980)).  This court agrees that Supreme Court precedent compels the conclusion that the weighing and comparing of qualifications is part of the defendant's obligation to state a non-discriminatory reason for the employment action taken, and not a requirement of the plaintiff's *prima facie* case.  See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without requiring the factfinder to make any inferences or presumptions.  Carter v. City of Miami, 870 F.2d 578, 580-81 (11th Cir. 1989).  Where there is no direct evidence, the plaintiff must prove intent through circumstantial evidence in accordance with  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  When the plaintiff relies upon circumstantial evidence, rather than direct evidence, she creates a presumption of discrimination by establishing a *prima facie* case.   The presumption may be rebutted, however, if the employer offers a legitimate, nondiscriminatory reason for the employment action.  Once the nondiscriminatory reason is articulated, the burden shifts to the plaintiff to show that the reason is either not worthy of belief, or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the proffered reason.  Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998) reh'g and reh'g *en banc* denied, 172 F.2d 884 (11th Cir. 1999), citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

Dr. Kim alleges that she is in a protected class of "Asian females of Korean descent."   She argues that she was discriminated against on the basis of this combination of factors, not solely because she was Asian, or female, or of Korean

descent, separately.[7]  The parties do not dispute that Dr. Kim is a member of these protected classes.  The parties also do not dispute that the denial of her applications for tenure and promotion constituted adverse employment actions. The issues in this case arise over whether the plaintiff was qualified for the job of associate professor, whether A&M treated similarly situated faculty applicants from outside her protected class more favorably, and whether A&M has offered a legitimate, nondiscriminatory reason for failing to award Dr. Kim tenure and a promotion.

### 1.  Qualified Individual

A&M first argues that Dr. Kim is not a qualified individual because she provided insufficient evidence of publication of scholarly work to qualify for tenure or promotion.  It is undisputed that A&M required all tenure candidates to demonstrate "[p]ublication in refereed journals, scholarly books, chapters in scholarly books, research reports, attendance at scientific/professional meetings, reviewer for journal, proposals, creative works, etc. related to the discipline."  (See Faculty Handbook, at p. 49).  Viewing the evidence in the light most favorable to the plaintiff, there is evidence that Dr. Kim was published repeatedly in a journal

---

[7]    Dr. Kim admits that Asian *males* were not subjected to discrimination by A&M, nor were white or African American *females*.  She also seems to admit that other foreign-born persons (of either sex) were not victims of discrimination. She posits that she was discriminated against only because she was uniquely in the class of "Asian females of Korean descent," thus implicating a combined form of gender, race, and national origin discrimination.

entitled *Social Welfare*, which is purportedly a refereed pre peer-reviewed journal.[8] The defendant argues that the plaintiff failed to demonstrate that *Social Welfare* was a refereed journal and, therefore, her publications in it did not meet the requirements for scholarly productivity.  Although the plaintiff has demonstrated that other candidates for tenure were not required to offer any proof of the nature of the publication in which their articles appeared, she has not shown that the journals of other applicants were either unknown to A&M or were published in a foreign language that prevented A&M for judging the scholarly quality of the

---

[8]    The defendants assert that the plaintiff failed in providing "documentation of scholarly research" because she had no "evidence that [her *Social Welfare* articles] are … peer reviewed, juried, or refereed." (Doc. 48, p. 38, citing Wims Depo., p. 60; Wims Affi., ¶ 62).  Plaintiff contends that she has provided evidence that other applicants for tenure were not required to provide documentation relating to the publishing practices of the journals in which they had been published and, therefore, there is at least a jury question as to whether plaintiff's "list" of articles could be deemed sufficient. The court disagrees.  That other applicants were not required to document the publishing practices of journals in which they published does not indicate that plaintiff was held to a discriminatorily higher standard.  In making tenure and promotion decisions, it is possible (perhaps probable) that evaluators would be familiar with the journals used by other applicants and would not need additional documentation to know the publishing practices of the journals.  In the plaintiff's case, the evaluators were not familiar with *Social Welfare.*  It was published in Korea in the Korean language. Plaintiff did not provide them with English translations of her articles, which they could read to assess for scholarly quality.   Under these circumstances, the evaluators could properly require additional information about the journal, which they would not need for journals familiar to them, before determining that the publication was sufficiently scholarly to meet tenure and promotion requirements. Thus, the mere fact that plaintiff was asked for additional documentation about the publishing practices of *Social Welfare,* when other applicants were not asked to document the practices of journals in which they had published, does not itself create a jury question.

journals.  A question of fact is created on this point only if other applicants relied on unknown, foreign-language journals similar to that put forward by the plaintiff. For example, that an applicant who published in a well-known, American professional journal is not required to document the publishing standards of that journal does not mean that requiring plaintiff to document the standards used by an unknown, foreign-language journal is an act of discrimination.  Such evidence is simply lacking in this case.  Plaintiff has not pointed to a successful applicant whose publications are in a similar unknown, foreign-language journal, like *Social Welfare*, but who was not required to explain or document the standards of that journal.

Although it is undisputed that the plaintiff had the requisite recommendation letters, educational background, and teaching experience to qualify for promotion and tenure, defendant contends she did not show adequate scholarly productivity by publishing in refereed or peer-reviewed journals, and, therefore, was not "qualified" for either the promotion or tenure.  Defendant has explained why it did not accept plaintiff's publications in *Social* Welfare as sufficient evidence of scholarly productivity, and plaintiff has failed to show that there is any fact question about the validity of the explanation.  The objective qualifications for tenure and promotion listed in the Faculty Handbook include publication in refereed or peer-reviewed journals or books, and plaintiff simply failed to show

that her publications met that requirement.  No jury question exists, therefore, as to whether the lack of other publications made her an "unqualified" individual. Accordingly, the defendant has demonstrated that the plaintiff was not "qualified," as required as an element of her *prima facie* case.[9]

### 2. Comparators

Plaintiff's *prima facie* showing requires that she demonstrate that similarly-situated faculty members who were not "Asian females of Korean descent" at A&M were treated more favorably when they applied for tenure.[10]  It is well established that for plaintiff to prove her allegations of discrimination, she must demonstrate that a "similarly situated" employee, not a member of her protected class, applied for tenure, was less qualified, and was granted tenure.  "The plaintiff and the employees she identifies as comparators must be similarly situated in 'all

---

[9]      The court has acknowledged the confused mess of precedent over whether an applicant's alleged lack of qualifications for promotion to a position is part of plaintiff's *prima facie* showing or the defendant's articulation of a legitimate, non-discriminatory reason for its decision.  While the court finds that, under the circumstances of this case, the plaintiff must prove her qualifications for academic promotion and tenure (and she failed to do so), the court will also discuss other elements of the plaintiff's *prima facie* case.

[10]     Although plaintiff has alleged that she was discriminatorily denied tenure *and* promotion to the rank of associate professor, the Faculty Handbook makes clear that the tenure decision was dispositive.  The Handbook states that if tenure is denied, the promotion application is not considered.  Thus, at least as a threshold matter, the court need only address whether the denial of tenure was illegally discriminatory.

relevant respects.'" <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1079, 1091 (11th Cir. 2004), quoting <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997).   A comparator must be "nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer."  <u>Wilson</u>, 276 F.2d at 1091, citing <u>Silvera v. Orange County School Bd.</u>, 244 F.3d 1253, 1259 (11th Cir. 2001).  This rule follows the more general mandate that it is not the duty of this court to evaluate whether the decision to deny tenure for Dr. Kim was fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes.  See <u>Elrod v. Sears, Roebuck and Co.</u>, 939 F.2d 1466, 1470 (11th Cir. 1991).   Moreover, courts have recognized that the discrimination laws should not be used to override employment decisions "based on individual assessments of a person's abilities, capabilities, or potential." <u>Magruder v. Selling Area Mktg. Inc.</u>, 439 F. Supp. 1155 (N.D. Ill. 1977).

In the context of the denial of tenure, deficient scholarhip has been deemed a legitimate, non-discriminatory reason for the denial of tenure and promotion among university faculty members.  <u>Geevarghese v. Cahill</u>, 983 F.2d 1066 (Table), 1992 WL 361369 at *5 (6th Cir. 1992) citing <u>Gutzwiller v. Fenik</u>, 860 F.2d 1317 (6th Cir. 1988).   In <u>Hossain v. Steadman</u>, an Asian male faculty member of Bangladeshi descent was denied tenure at the University of South Alabama.  855 F. Supp. 2d 1307 (S.D. Ala. 2012).  The plaintiff in <u>Hossain</u> alleged as comparators

other males, who were not of Bangladeshi descent.   The other faculty members were not deemed sufficient as comparators because they were "in different departments, had different department chairmen, and were reviewed, at least in part, by different evaluators."   855 F. Supp. 2d at 1314.   The court in Hossain noted that a defendant in an action brought pursuant to Title VII,  § 1981, or § 1983 has an "exceedingly light" burden and may "fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."   855 F. Supp. 2d at 1315, quoting Holifield v. Reno, 115 F.3d 1555, 15654 (11th Cir. 1997) and Nix v. WLCY Radio, 738 F.2d 1181, 1187 (11th Cir. 1984).

A female faculty member who was denied promotion to full professor failed to meet her *prima facie* case of discrimination in Wu v. Thomas, 847 F.2d 1480 (11th Cir. 1988), where she was denied the promotion on the basis of a lack of scholarly work in part because she could not show that an equally or less qualified male was promoted "during the time of her promotional application" when the decision was made by a new University president.   In Mangravite v. University of Miami, a plaintiff in an age discrimination case failed to name sufficient comparators where he attempted to compare his qualifications as a "creative professor" to that of a "traditional scholar."   838 F. Supp. 2d 1326, 1332 (S.D. Fla. 2011).

The cases cited by the parties, and by the court *supra*, stand for the proposition that Dr. Kim cannot claim as comparators faculty members who applied for positions other than associate professor, who applied in different years, who were granted tenure by different decisionmakers, or whose fields were otherwise not sufficiently similar.   See also Martin v. Auburn Univ. Montgomery, 908 F. Supp. 2d 1259, 1268-69 (M.D. Ala. 2012).   In addition, courts have recognized that subjective reasons, such as are involved in judging the sufficiency of scholarly works, are "acceptable non-discriminatory reasons for employment actions" and that tenure decisions "necessarily rely on subjective judgments about academic potential."   908 F. Supp. 2d at 1269, citing Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000)(*en banc*) and Vanasco v. National-Louis Univ., 137 F.3d 962, 968 (7th Cir. 1998).  Even when a plaintiff provided expert testimony that "his law review articles are scholarly" but not given "sufficient credit" by the university, the evidence was not enough to make the university liable for discrimination absent a showing that the real reason for the denial of tenure was illegal discrimination.  Kossow v. St. Thomas Univ., 42 F. Supp. 2d 1312, 1317 (S.D. Fla. 1999) (noting that, whatever the merits of the "publish or perish" rule, the courts must not interfere with the university's desire to be accepted in academic circles that adhere to the requirement that professors engage in scholarly research and writing).

In the instant case, plaintiff names six A&M faculty members who she claims were less qualified but were granted tenure or promotion:  Tonya Perry, an African American female; Andrea Hawkins, an African American female; Larry McDaniel, an African American male; Joel Fu, an Asian male; Zhigang Xiao, an Asian male, and Xing Zhong Shi, an Asian male.[11]   The plaintiff alleges that Perry was awarded tenure and promoted to full professor in 2009-2010; that Hawkins was awarded tenure and promoted to associate professor during the 2010-2011 academic year;[12] that McDaniel was awarded tenure and promoted to associate professor in the 2012-2013 academic year; and that Fu, Xiao, and Shi all were promoted to associate professor in the 2009-2010 academic year, but there is no allegation that they were granted tenure in those years.

Most of the plaintiff's allegations regarding the qualifications of the other faculty members are mere hearsay, based upon unauthenticated resumes.[13]   Even

---

[11]   The race and gender of the alleged comparators are asserted in the plaintiff's affidavit (Doc. 59, Ex. A) and are not disputed by the defendant.

[12]   The resume attached to plaintiff's submission as Ex. 6, which appears to be the resume of Hawkins, indicates that she attained the position of assistant professor of management in 2005.

[13]   A&M has moved to strike the evidence submitted in support of Dr. Kim's allegations of comparators.  Because, even accepting the evidence, the plaintiff has failed to meet her burden, the motion to strike (doc. 63) is MOOT. While the court has referred to the documents attached by plaintiff, and has not stricken them, the court must note that they are of little value.  Even if accepted as the actual resumes of the faculty members named, they are not dated and there is

assuming that the plaintiff could produce admissible evidence that these faculty members' qualifications were as described in the resumes submitted to the court, most are not substantially similar to Dr. Kim, who applied for tenure *and* promotion to *associate professor* in the department of *social work* in the academic years of *2009-2010 and 2010-2011*.   None of the alleged comparators, except Tonya Perry, was a faculty member of the department of social work.   Drs. Hawkins and McDaniel were on the faculty of the School of Business,[14] Drs. Fu and Shi were in computer science, and Dr. Xiao was in electrical engineering. While it appears that the "scholarly work" requirement applied to all departments, there has been no evidence that an assistant professor of electrical engineering, for example, would be expected to complete the same types of "scholarly work" as an assistant professor of social work.   It is plain also that, because these applicants (except Dr. Perry) were in other academic schools or departments, their tenure and promotion evaluators were different from those of the plaintiff.   Thus, except for Dr. Perry, none of the other alleged comparators was similarly situated to plaintiff.

---

no representation that they include all of the information that was provided to the university at the time that the applicants were seeking the promotion or tenure. The exhibits are, therefore, not probative evidence that assists the court in evaluating whether the plaintiff was treated differently than similarly situated faculty members who were not female Asians of Korean descent.

[14]     The exhibit relating to McDaniel does not even demonstrate that he was on the faculty at A&M, but does reflect that his background was in business management.

Dr. Perry, while also in the social work department, already was an associate professor (the rank to which plaintiff sought promotion), and had been teaching more than twice as long as Dr. Kim.   The only alleged comparator who was awarded tenure in 2009-2010 was Dr. Perry; the only alleged comparator awarded tenure in 2010-2011 was Dr. Hawkins.   Plaintiff alleges that Dr. McDaniel's application was considered two years later than the last time she applied.  Drs. Fu, and Shi were awarded a promotion but not tenure, and it therefore is clear that they were not seeking the same position as the plaintiff.  Because the "scholarly work" requirement in Subsection G of the Faculty Handbook applies only to applicants for tenure, Drs. Fu and Shi, as applicants for promotion only, are not comparable to plaintiff.[15]

Even if the scholarly work requirement for an applicant for tenure and promotion to associate professor in social work in 2009-2010 could be considered the same as an application for tenure and promotion to full professor, the plaintiff's argument would succeed only if the quantity of published work were the standard, without regard to the quality.   Plaintiff has presented no evidence that A&M employed a mere "counting" of publications when making its decisions on the

---

[15]      While the promotion requirement set forth some requirements regarding publication, research, or other scholarly activities, the requirements differ between applicants for promotion to assistant professor, to associate professor, and to professor, and are separate and distinct from the scholarly work requirement for tenure applicants.  (Doc. 50, pp. 45-49).

hiring of faculty members.  The evidence presented by A&M indicates that the process involved – as one might expect in an academic position – an evaluation of the content and quality of publications.  The fact that A&M was unable to make a judgment about the quality of the content of a publication that was published in Korea and in the Korean language does not raise any inference of discrimination. Moreover, Dr. Kim has not produced any evidence, or even alleged, that any other applicant relied upon publications in a foreign publication without providing some translation of the article into English.

   In sum, the six faculty members named by the plaintiff are not sufficiently similar to be considered comparators to the plaintiff, who had only five years of teaching experience and was an assistant professor when she applied for and was denied tenure (and thus promotion) because of a lack of scholarly publication.  The allegations about other faculty members, even if they had been properly presented to this court, do not support a claim under Title VII; therefore, defendant's motion for summary judgment is due to be granted because the plaintiff has failed to prove an element of her *prima facie* case.[16]

---

[16]     The Eleventh Circuit Court of Appeals has recognized that failure to point to a comparator "does not necessarily doom the plaintiff's case," and that a claim may survive where the plaintiff presents "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."   Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).   Even so, the circumstantial evidence must provide more than a "suspicion or guess;" and must be sufficient to create a "convincing mosaic of circumstantial evidence that would

### 3.  Pretext

Even when a plaintiff has succeeded in making a *prima facie* showing of any type of prohibited discrimination, the presumption of discrimination that is raised by the *prima facie* showing may be rebutted if the employer articulates a legitimate, nondiscriminatory reason for the employment action.  To satisfy this burden, "the employer need only produce admissible evidence which would allow the trier of fact to rationally conclude that the employment decision had *not* been motivated by discriminatory animus."  Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), quoting Texas Dept. Of Comm. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 1096, 67 L. Ed. 2d 207 (1981) (emphasis added). Once the nondiscriminatory reason is articulated, the burden shifts to the plaintiff to show that the reason is either not worthy of belief, or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the proffered reason.  Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998) reh'g and reh'g *en banc* denied, 172 F.2d 884 (11th Cir. 1999), citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied,

---

allow a jury to infer intentional discrimination by the decisionmaker."  644 F.3d at 1328, quoting Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999); Silverman v. Board of Educ., 637 F.3d 729, 733 (7th Cir. 2011).  In this case, however, plaintiff has offered no evidence that would allow a jury to infer that Dr. Wims or Dr. Hugine, as decisionmakers, had any intent to discriminate against Asian females of Korean descent.  In fact, she has offered no evidence that the decisionmakers were aware that Dr. Kim was of Korean descent or even female.

118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).  She must show not only that the

articulated reason is false, but also that the true reason for terminating him was

discriminatory.  See Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir.

1993).

Proof of pretext was discussed by the Supreme Court in Reeves v.

Sanderson Plumbing Products, Inc.:

> Although intermediate evidentiary burdens shift back and forth under
> this framework, "[t]he ultimate burden of persuading the trier of fact
> that the defendant intentionally discriminated against the plaintiff
> remains at all times with the plaintiff." *Burdine,* 450 U.S., at 253, 101
> S. Ct. 1089.  And in attempting to satisfy this burden, the plaintiff—
> once the employer produces sufficient evidence to support a
> nondiscriminatory explanation for its decision—must be afforded the
> "opportunity to prove by a preponderance of the evidence that the
> legitimate reasons offered by the defendant were not its true reasons,
> but were a pretext for discrimination." *Ibid.*; see also *St. Mary's Honor
> Center, supra*, at 507–508, 113 S. Ct. 2742.  That is, the plaintiff may
> attempt to establish that he was the victim of intentional
> discrimination "by showing that the employer's proffered explanation
> is unworthy of credence."  *Burdine, supra*, at 256, 101 S .Ct. 1089.
> Moreover, although the presumption of discrimination "drops out of
> the picture" once the defendant meets its burden of production, *St.
> Mary's Honor Center, supra,* at 511, 113 S. Ct. 2742, the trier of fact
> may still consider the evidence establishing the plaintiff's prima facie
> case "and inferences properly drawn therefrom ... on the issue of
> whether the defendant's explanation is pretextual," *Burdine, supra*, at
> 255, n. 10, 101 S. Ct. 1089.

530 U.S. 133, 144, 120 S. Ct. 2097 (2000).

It is not the duty of this court to evaluate whether the decisions to deny Dr. Kim's application for tenure and promotion were fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes.  See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991).

In this case, A&M asserts that the decision to deny tenure to Dr. Kim was based upon the lack of a showing that she had produced sufficient scholarly work during her probationary employment.  This decision, in turn, was based upon the fact that Dr. Wims did not have access to copies of her publications in *Social Welfare*.  They were in Korean and they were not in any library he located. Dr. Kim argues that this reason is pretextual, and she supports her argument by showing that other faculty members, specifically Dr. Shi and Dr. Rory Fraser, were not asked to provide documentation, beyond copies of their articles, of their scholarly publications.  (Doc. 60, pp. 7-13).

The defendant points out that Dr. Shi was a non-tenure-track faculty member and was never eligible to apply for tenure; therefore, no tenure requirements could be applied to him.  (Doc. 62, p. 19).  The defendant further argues that Dr. Fraser applied for tenure in 2003, six years before Dr. Kim first applied, and long before either Dr. Wims or Dr. Hugine became involved in the decision-making process. (Id.)  To the extent that Dr. Fraser's tenure application was treated differently from

plaintiff's, it occurred under a different Faculty Handbook with different decisionmakers.   Accordingly, what was asked of Dr. Kim does not correlate to what may have been asked, or not asked, of Drs. Shi and Fraser.

The court also sees a more fundamental difference.  Dr. Kim has not shown, and has not even alleged, that any faculty member other than herself relied upon articles written in another language, published in another country, and that were unavailable at regional university libraries.  The evidence before the court fails to show that, other than Dr. Kim, who offered as part of her scholarly publications articles written in Korean in *Social Welfare*, a journal published in Korea, any other faculty member relied upon a foreign-language publication as proof of scholarly productivity.   Dr. Kim's argument would put the burden on A&M of locating from any country on earth, and then translate from any language, every article alleged to have been written by every applicant for tenure or promotion. Because tenure and promotion applicants are required to apply and present evidence of their qualifications for tenure and/or promotion, the burden of proving sufficient scholarly productivity is on the applicant.   Conversely, Dr. Kim's argument would compel any faculty member who had, for example, authored a well-known article in a leading journal carried in the university library, to provide "proof" that the journal was peer-reviewed.  It is nonsensical to require the same documentation regarding publications in the <u>New England Journal of Medicine</u> as

might be required for a virtually unknown foreign-published, foreign language publication that is not widely available in the state, region, or country where the university is located.  A university can rationally, and without being guilty of discrimination, require a tenure or promotion applicant to prove that publication in such a foreign journal involves sufficient scholarly rigor for purposes of meeting its tenure or promotion requirements.

Dr. Kim further asserts that the quantity of her publications in *Social Welfare* should have been considered to make her "more qualified" than applicants with fewer articles.  Dr. Wims testified, however, that the quantity (approximately four per year) was viewed as an indication that the works may *not* be sufficiently scholarly.  The university certainly has a basis for questioning the quality of research that must be performed for completing a scholarly work, when the works are published in what would be, by academia standards, rapid-fire succession.  Dr. Kim failed to provide English-language translations of the articles to demonstrate their scholarly quality.  In the absence of translated versions of the articles or some additional documentation concerning the academic quality of *Social Welfare*, A&M was not required to accept Dr. Kim's *ipse dixit* that her articles demonstrated sufficient scholarly productivity.

In short, A&M has provided a reasonable basis for desiring more information about Dr. Kim's publications, and there is no evidence of any sort that

suggests that the basis for requiring additional documentation was discrimination on account of Dr. Kim's race, national origin, or gender.

Dr. Kim further argues that A&M provided "shifting" reasons for the denial of tenure.  In support of this argument she cites Dr. Hugine's deposition testimony to the effect that he denied Dr. Kim's tenure application in 2010 "based on lack of sufficient scholarly work or productivity," but in 2011 he denied tenure based upon "lack of peer reviewed, juried and/or refereed scholarly productivity in the discipline."  (Doc. 60, p. 10).  While the words of her rejection letter changed, the court finds that A&M's reason for denial was clear each time:  the university simply was not convinced that Dr. Kim's frequent articles in a Korean publication no one had ever seen or could locate in a library was sufficient "scholarly work." Indeed, after Dr. Kim's 2009 application for tenure and promotion was denied, she was told specifically that the articles she claimed in *Social Welfare* could not be verified as scholarly works.  She had the opportunity to provide translated versions of the articles or additional documentation about the journal, but failed to do so.[17] Accordingly, the wording of Dr. Hugine's letters, which became more specific in

---

[17]    Plaintiff contends that her department chair provided additional documentation about *Social Welfare*. This documentation, however, consisted of nothing more than a letter from the department chair reporting that she had an email conversation with someone identified as the editor of the journal, from which she concluded that it was a peer-reviewed journal.  Again, it would not be discriminatory for the University to find this email assurance insufficient.

2011, did not indicate any "shift," much less that the reason given for the tenure denial was false and that discrimination was the true reason.

For all of these reasons, the plaintiff has failed to demonstrate that the defendant's proffered, nondiscriminatory reason for the adverse employment actions is not worthy of belief. Accordingly, the motion for summary judgment regarding plaintiff's Title VII discrimination and § 1983 equal protection claims is due to be granted.

## B.  RETALIATION

Defendant seeks summary adjudication on plaintiff's claim of retaliatory discharge in violation of Title VII. Defendant asserts that plaintiff is unable to offer evidence to meet the elements required to prove a *prima facie* case of Title VII retaliation.

Title VII's anti-retaliation provision states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter....

42 U.S.C. § 2000e-3(a). In order to survive a properly supported motion for summary judgment, the plaintiff in a Title VII retaliation case must establish a *prima facie* case by showing: (1) that she engaged in protected conduct and (2)

suffered an adverse employment action that was (3) causally connected to the protected expression.  Bolivar v. University of Georgia Survey and Research, slip op. No. 3:11-CV-24, 2012 WL 4928893 *8 (M.D. Ga. Oct. 16, 2012); Taylor v. Runyon, 175 F.3d 861, 868 (11th Cir. 1999).  In addition, the plaintiff must show that her employer was aware of her participation in the protected activity when it took the adverse action.  Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999).  The plaintiff has the obligation to show a causal connection by showing "that the decision makers were aware of the protected activity and the protected activity and the adverse action were not wholly unrelated."  Bass v. Board of County Comm'rs., Orange County, 256 F.3d 1095, 1119 (11th Cir. 2001) (overturned on other grounds).  The causal link requirement is to be construed broadly, and the Eleventh Circuit Court of Appeals has stated that "a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated."  Brungart v. Bellsouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000) (quoting Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999).).  However, to meet even this low threshold of proof of causation, the plaintiff must offer some evidence from which a jury could infer that the protected activity caused the adverse employment action.

Plaintiff alleges that she engaged in protected activity by filing three EEOC charges of discrimination in December 2010, May 2011, and June 2012.  Because

plaintiff's employment with A&M ended in May 2012, the last EEOC charge could not have produced any adverse employment consequences. Also, it is clear that, because her first application for tenure and promotion was denied in July 2010, that denial was not in any way causally related to the later-filed charges in December 2010 and May 2011.[18]  Thus, plaintiff can contend only that the denial of tenure and promotion in June 2011 was causally related to her charges in December 2010 and May 2011.

It is clear from the history of plaintiff's applications for tenure and promotion that the denials in June 2011 were not retaliatory, but occurred for the same reason as the denials occurring a year earlier: plaintiff failed to provide sufficient documentation showing scholarly productivity.  The issue remained the same as it has existed when her 2009 application was denied.  Plaintiff's failure to provide either translated versions of her *Social Welfare* articles or additional documentation confirming the scholarly quality of the publications left the tenure/promotion decision in the same posture as the 2009 application.  Although

---

[18]     Although it is true that the appeal of the denial of her tenure and promotion application was itself denied in February 2011, after the December 2010 EEOC charge, the reasons and bases for the denial were first articulated in the July 2010 letters denying tenure and promotion.  There is no evidence from which to infer that such reasons and bases were not the same when the appeal was denied. Indeed, in the December 2010 charge itself, plaintiff alleged that the appeal was denied "in September and October 2010," *before* she filed the charge.  (Doc. 52, p. 149 of 153).  Certainly, the Provost, Dr. Wims, had made his recommendation to President Hugine to deny the appeal before the charge was filed.

the May 2011 charge was filed only a month before the decisions denying plaintiff's second application for tenure and promotion in June, the reason for the denial of tenure and promotion were well-known to plaintiff and articulated to her long before that date.  In light of the history of plaintiff's applications and the clear reason given for denial of tenure and promotion, there is no evidence showing that the denials in June 2011 were causally related to the December 2010 or May 2011 EEOC charges.

There is no dispute that Dr. Kim engaged in protected activities each time she filed charges with the EEOC.  Plaintiff does not allege that the first denial of tenure in 2010 was retaliatory – since it occurred prior to her protected activity – but does allege that the 2011 denial was retaliatory.  Her only argument that a causal connection exists is that she "was still participating in the investigation of said charges on the date she received her final notice of rejection."  (Doc. 60, p. 13).  This bare fact is insufficient to show causation.  Moreover, the fact that the tenure was denied for the same reason after the protected activity as before – the insufficient evidence of her published works – weighs heavily in A&M's favor.  Even though plaintiff argues that, because the wording of the letters were slightly different each time, that these were "shifting reasons" that indicate that the reasons given were not the real reason.  The court, however, finds that the letters denying her tenure and promotion from A&M, while providing slightly different

descriptions of the insufficiency of her published work, were always indicative of the same problem – a lack of clarity concerning the content or quality of her publications in *Social Welfare*.

The plaintiff also asserts that A&M retaliated against her by failing to inform her of the deadline for reapplying for tenure and by subjecting her travel requests to stricter scrutiny.  The undisputed facts demonstrate, however, that she was notified before the deadline for application and that she did, in fact, reapply. Furthermore, even though she alleges this close scrutiny of her travel requests, she does not allege that any travel requests were denied.  The court is not convinced that closer scrutiny of travel requests that does not result in the *denial* of any travel request is a sufficiently adverse employment action that would deter a reasonable employee from engaging in protected activity under Title VII.  See Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006).  Although the concept of an "adverse action" is more broadly defined in the context of retaliation than in the context of employment discrimination and ordinarily is a jury question, "'petty and trivial' actions by the defendant are not sufficiently adverse" and do not warrant a jury determination.  Rainey v. Holder, 412 F. App'x 235, 238 (11th Cir. 2011) citing Crawford v. Carroll, 529 F.3d 961, 974 n. 13 (11th Cir. 2008) (citation omitted).

Accordingly, these allegations do not rise to the level of an "adverse employment action.

In sum, plaintiff has provided insufficient evidence from which a jury could infer that the defendant's articulated reason for the denial of tenure is not worthy of credence and that the real reason was retaliation.  For this reason, defendant's motion for summary judgment on the retaliation claim is due to be granted.

## C.  CLAIMS ARISING UNDER §§ 1981 and 1983

The plaintiff does not set forth any separate claims under 42 U.S.C. §§ 1981 or 1983, although she does cite these statutes as a basis for a "permanent injunction enjoining the defendants… from continuing to violate the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*."  (Amended Complaint, doc. 16, p. 7).  Defendant seeks dismissal of all claims, and argues that Section 1983 is inapplicable, as a due process claim, because the plaintiff had no property interest in the position, as she had never been granted tenure.  Plaintiff does not address such claims in her opposition to the motion for summary judgment.

The court agrees that employment rights are not "fundamental" rights protected under the federal constitution and that, without tenure, no property right in a job exists.  See, *e.g.*, Gray v. Board of Regents of the Univ. Sys., 150 F.3d 1347, 1350 (11th Cir. 2011).  To the extent that the plaintiff seeks redress under

§ 1983 or § 1981, the claims are analyzed under the same McDonnell-Douglas framework as employed *supra*, and thus she is not entitled to any relief.  Hossain, 855 F. Supp. 2d at 1314.   Accordingly, the defendant's motion for summary judgment is due to be granted.


## CONCLUSION

For all of the foregoing reasons, the defendant's motion for summary judgment is due to be granted and all of plaintiff's claims are due to be dismissed with prejudice.  A separate order will be entered in according with the findings set forth herein.

DONE this 24th day of September, 2014.


T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE